UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

HEENA SHIM-LARKIN,

        Plaintiff,

        -against-

CITY OF NEW YORK,

        Defendant.

-----------------------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/16/19

**MEMORANDUM and ORDER**

16-CV-6099 (AJN)(KNF)

## INTRODUCTION

Plaintiff Heena Shim-Larkin ("Shim-Larkin"), proceeding pro se, brought this action pursuant to Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990 and New York State and City anti-discrimination laws, based upon allegations of discriminatory conduct to which she was subjected in the summer of 2015, during her tenure as a seasonal lifeguard at the defendant's Department of Park and Recreation ("DPR"), Tomkins Square Mini Pool ("TSMP"). Before the Court is a motion by Shim-Larkin, made pursuant to Rules 26(g), 37(b)(2)(A)(i) and 37(e) of the Federal Rules of Civil Procedure and the Court's inherent power, for spoliation sanctions to be imposed upon the defendant, owing to the loss permanently of electronically stored information ("ESI"), specifically, the contents of text messages stored on the personal cellular telephone of Martin Kravitz ("Kravitz"), the defendant's assistant lifeguard coordinator. In addition, Shim-Larkin seeks an order directing the defendant to pay the costs and expenses she incurred in relation to the motion, pursuant to Rules 26(g)(3), 37(a)(5) and 37(b)(2)(c) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927 and the Court's inherent power. Shim-Larkin also requests that the Court "impose other sanctions against Defendant and its counsel which court deems just and proper pursuant to FRCP 26(g), FRCP 37(b)(2)(A), FRCP 37(e), and the Court's inherent power."

In support of her motion, Shim-Larkin filed a memorandum of law and a declaration, to which she attached exhibits, including telephone records generated by: 1) Remind, a mobile application Kravitz used on his personal cellular telephone to communicate via text messages; and 2) AT&T, Kravitz's cellular telephone service provider. The defendant opposes the motion through a memorandum of law and a declaration filed by its counsel, Dominque F. Saint-Fort ("Saint-Fort"), to which she attached exhibits.

## THE MOTION

### Plaintiff's Contentions

According to Shim-Larkin, she was scheduled to begin working at TSMP on July 1, 2015. However, a DPR lifeguard coordinator permitted her to begin working on July 2, 2015, so that she might attend "a mandatory doctor's appointment [on July 1, 2015,] that was required if she was to continue residing in her domestic violence shelter." On July 3, 2015, Shim-Larkin met the TSMP head lifeguard, Miguel Morel ("Morel"), "who was in charge of the schedule and day to day activities at the pool." On the day Shim-Larkin met Morel, he "expressed his hostility against" her because she "had taken July 1, 2015 off [from work], even after he learned that she had taken the day off to attend a mandatory doctor's appointment required" for her continued residence in the domestic violence shelter. Shim-Larkin contends that, later that day, she informed Morel that she had an appointment scheduled with federal immigration officials for July 10, 2015. Morel advised her that she "could not take that day off because it fell on the regular day off of" Jennifer Navarro ("Navarro"), another TSMP lifeguard. Morel told Shim-Larkin to report to work on July 10, 2015, "leave for her appointment, but not inform . . . Kravitz." Shim-Larkin "did as she was told by Morel." Thereafter, Morel raised her immigration status and the July 10, 2015 appointment frequently, "to make Plaintiff feel uncomfortable." According to Shim-Larkin, Morel "threatened to get her into trouble" because it was "illegal for [Shim-Larkin] to have been paid for time that she was at her immigration appointment and not at her post."

-2-

Shim-Larkin maintains that, as the summer progressed, Morel's hostility toward her was manifested in several ways. For example, he did not give Shim-Larkin an equal number of breaks from work as he and Navarro took. Shim-Larkin contends that she complained about this to Kravitz on July 12, 2015, via a text message. Thereafter, on July 14, 2015, Kravitz visited TSMP and met with her, Morel and Navarro concerning the breaks from work they were to receive. Shim-Larkin recalls that, during that meeting, Morel invoked the union rule mandating two 15 minute breaks and stated that since "[Shim-Larkin]'is getting those two 15 minute breaks, there is no problem." According to Shim-Larkin, Kravitz agreed and indicated "there is nothing [he] can do."

Shim-Larkin contends that she also complained to Kravitz on July 31, 2015, via a text message, about the pool deck sitting schedule that "Morel and Navarro created on July 30, 2015 and attached the sitting schedule to the text message." Shim-Larkin maintains that Navarro acted as Morel's recorder when they created the schedule. On August 19, 2015, Shim-Larkin "was scheduled to take a break from 5pm [sic] to 6 pm [sic]," but neither Morel nor Navarro "came to the pool deck to release Plaintiff." Shim-Larkin asked Morel and Navarro to return to the pool deck to relieve her, but they "refused to come to the deck and ran away from the pool area." Shim-Larkin sent Kravitz a text message explaining the situation. Shim-Larkin maintains that Kravitz then called Morel, who returned "to the pool deck and Plaintiff was able to take a break."

According to Shim-Larkin, as she walked "away from the pool deck, Navarro shouted at Plaintiff 'Remember! Snitches get stitched!'" When Shim-Larkin returned "to the pool deck around 6pm [sic], Morel was waiting for Plaintiff with a water hose and sprayed Plaintiff." Shim-Larkin maintains that she "texted Kravitz that '[Morel] attacked me with the hose and water.'" Shim-Larkin asserts that, during the deposition Navarro gave in connection with this action, she acknowledged witnessing the water hose incident and recalled that it occurred at about closing time for the pool. As a result of the water hose attack, Shim-Larkin filed a complaint against Morel with the defendant's police department.

-3-

Shim-Larkin contends that during the summer of 2015, Navarro also expressed her dislike of Shim-Larkin openly.  According to Shim-Larkin, Navarro recounted for her a conversation that Navarro had with Morel, Kravitz and Miguel Rios ("Rios"), DPR's lifeguard borough coordinator, during which Navarro commented that she and Morel "did not like Plaintiff as a rookie lifeguard at [TSMP]" because Shim-Larkin is old and Korean.  Shim-Larkin recalls that Navarro did not report to her that Morel said anything to rebuke Navarro for implying that Shim-Larkin was a less valuable employee because she is old and Korean.

Shim-Larkin contends that her 2015 seasonal lifeguard experience prompted her to file a Charge of Discrimination ("Charge") with the United States Equal Employment Opportunity Commission ("EEOC"), which the defendant received on November 16, 2015.  The defendant responded to the Charge through a January 25, 2016[1] "position statement" prepared and submitted to the EEOC, on the defendant's behalf, by DPR assistant counsel Darci Frinquelli ("Frinquelli").  Frinquelli prepared the position statement after interviewing Kravitz in December 2015.  Although Shim-Larkin maintains that Kravitz communicated with her, Morel and other DPR personnel via text messages during the summer of 2015, through the "position statement," the defendant advised the EEOC, inter alia, that "[w]ith respect to Ms. Shim Larkin's claims that she communicated with Mr. Kravitz via text message about a potential transfer, Mr. Kravitz . . . has no recollection of giving Ms. Shim Larkin his cell phone number nor does he recall ever communicating with her via text message during the summer of 2015."

Shim-Larkin contends that when Kravitz told Frinquelli he did not recall giving Shim-Larkin his cellular telephone number or communicating with her via text messages during the summer of 2015, Kravitz was "lying" because he was unaware that Remind kept a record of his text messages and that Shim-Larkin would obtain that record and establish that he communicated with her and other DPR

---

[1]The position statement is dated "January 25, 2015"; however, since Shim-Larkin's Charge was not received by the defendant until November 16, 2015, the Court concludes that the 2015 date on the position statement is a typographical error.

lifeguard personnel using text messages. Shim-Larkin maintains that "Remind is a text messaging application, which allows its users to send and receive text messages through fake numbers which are not [the] users' actual phone numbers, thus, eliminates the need for users to exchange their actual phone numbers." Shim-Larkin contends that she attempted, on August 10, 2017, to obtain text messages Kravitz exchanged with Morel concerning her and TSMP during the summer of 2015, when she served her Fifth Set of Document Requests on the defendant. Shim-Larkin asserts that, in responding, the defendant tried to construe the demand for documents unreasonably as seeking only the production of correspondence or email communications between Kravitz and Morel; but the defendant's attempt was rebuffed by the Court, during a telephone conference with the parties.

According to Shim-Larkin, Kravitz was deposed in connection with this action on December 5, 2017. During his deposition, Kravitz acknowledged that, although the defendant provided him with a cellular telephone for his work-related activities, he relied principally on his personal cellular telephone for work-related communications. Kravitz explained that "[t]he majority of my calls would come from my personal phone . . . simply because it's just easier." Shim-Larkin contends that through a declaration, dated January 18, 2018, Kravitz prepared in connection with this action, Kravitz stated that he was "no longer in possession of the personal cell phone [he] used between June and September 2015 . . .[,] as it is [his] recollection that [he] donated the device through an ecoATM in a Wal-Mart . . . in or about March 2016." Shim-Larkin maintains that, prior to filing the instant motion, she tried to ascertain whether the defendant instructed Kravitz to preserve his personal cellular telephone. However, Shim-Larkin recalls that Saint-Fort "refused" to state "whether there was any instruction given to Kravitz to not discard his phone."

Shim-Larkin contends that, upon receiving her EEOC Charge in November 2015, the defendant should have anticipated that litigation would ensue and should have directed DPR to: 1) "[inspect] the 'personal' cellphone device of Kravitz to make sure there was [sic] no text messages between plaintiff

-5-

and Kravitz"; 2) take action to preserve evidence stored on Kravitz's personal cellular telephone, including relevant work-related text messages; and 3) ensure that Kravitz would not discard his personal cellular telephone, since the majority of his work-related telephone communications were made using that device. Shim-Larkin maintains that Kravitz discarded his cellular telephone because "he expected that Plaintiff would not be able to prove text message records between Plaintiff and Kravitz without Kravitz's cellphone device." However, Kravitz was wrong because "Plaintiff was eventually able to recover text message [history] records [and the contents of those communications exchanged] [via] Remind [by] Plaintiff and Kravitz." Shim-Larkin contends that she has not been able to recover the contents of the text messages Kravitz exchanged with Morel that are reflected in Kravitz's AT&T telephone records because Kravitz discarded his personal cellular telephone.

According to Shim-Larkin, Kravitz's AT&T telephone records show that text message communications were exchanged by Kravitz and Morel, as early as July 1, 2015, the day on which she was originally scheduled to start working at TSMP and continued to be exchanged by them throughout her 2015 tenure as a TSMP lifeguard. Shim-Larkin contends that her inability to retrieve the contents of the AT&T-related text messages Kravitz and Morel exchanged has prejudiced her because Kravitz's AT&T telephone records show that, at or about the time when key events relevant to the claims made in this action occurred, Kravitz and Morel were communicating via text messages. For example, on July 21, 2015, in the early part of the afternoon, Morel was screaming at her which, a pool patron, Leticia Vargas ("Vargas") witnessed. Shim-Larkin contends that records maintained by the defendant's Department of Information Technology and Telecommunications and the defendant's 311 telephone complaint system, indicate that at 1:08 p.m. on July 21, 2015, Vargas contacted the defendant telephonically to report that she observed Morel screaming at Shim-Larkin in a threatening manner and that he smelled of alcohol. According to Shim-Larkin, Kravitz's AT&T telephone records show that, between 1:00 p.m. and 1:10 p.m. on July 21, 2015, Morel sent Kravitz three text messages. Thereafter,

Kravitz traveled to TSMP and spoke to Vargas.  Kravitz's DPR "Drivers Daily Report" for July 21, 2015, Docket Entry No. 184-2, shows that he arrived at TSMP at 1:53 p.m. and departed at 2:25 p.m.  Shim-Larkin maintains that on the following morning, Kravitz and Morel exchanged three additional text messages.

In addition, Shim-Larkin contends that Morel: 1) videotaped her on August 4, 2015; 2) exchanged text messages with Kravitz on that date, as shown in Kravitz's AT&T telephone records; and 3) sent Kravitz a "pict Video" on August 4, 2015, which is also reflected in Kravitz's AT&T telephone records.  After the defendant disclosed to Shim-Larkin the August 4, 2015 video Morel shared with Kravitz, Shim-Larkin confirmed that it is the video Morel made of her on that date.  Shim-Larkin also contends that on August 19, 2015, the date on which she alleges Morel "attacked" her with a water hose in the early evening, Kravitz's AT&T telephone records show that Morel communicated with Kravitz, at 6:20 p.m., via text message.  Shim-Larkin recalls that Navarro testified at the deposition she gave in connection with this action, that she did not have time to speak with Morel about the water hose incident on August 19, 2015, because it occurred in the evening, about the time at which TSMP was closing. Shim-Larkin maintains that the temporal proximity between the occurrence of many events relevant to the claims she has made in this action and the text message communications Kravitz and Morel had, demonstrates the: 1) significance of the discarded cellular telephone to this case; 2) falsity of the assertion the defendant and Kravitz made to the EEOC, that he had no recollection of communicating with her via text messages during the summer of 2015; 3) bad faith of Kravitz in discarding his cellular telephone, as well as his culpable state of mind; and 4) prejudice to her of being unable to recover the contents of the text messages Kravitz and Morel exchanged, at or about the time key events germane to this action occurred, that are reflected in Kravitz's AT&T telephone records.

Shim-Larkin asserts, that as a consequence of the defendant's failure to take reasonable and timely action to preserve evidence stored on Kravitz's personal cellular telephone, including work-related

text messages, resulting in the spoilation of that evidence, the Court should sanction the defendant by directing that "the following facts be taken as established for the purpose of this action, pursuant to FRCP 26(g), FRCP 37(b)(2)(A)(i), 37(e), and the Court's inherent power":

> a) Miguel Morel was informed by Martin Kravitz . . . that Plaintiff cannot work on July 1, 2015 because of doctor's appointment which was necessary to live in domestic violence shelter; b) Morel expressed his hostility against Plaintiff for not working on July 1, 2015, due to the aforementioned doctor's appointment to Kravitz; c) Morel admitted to Kravitz that Plaintiff complained to Morel for not getting equal breaks as Morel and Jennifer Navarro; d) Morel expressed to Kravitz that Morel is not going to give equal breaks to Plaintiff as Morel and Navarro; e) Kravitz agreed with Morel on not giving Plaintiff equal breaks as Morel and Navarro; f) Morel admitted all facts asserted by Leticia Vargas to Kravitz; g) Morel admitted that he made the sitting schedule on July 30, 2015 (ECF #93-6) and sent it to Kravitz; h) Morel admitted that he recorded a video of Plaintiff on August 4, 2015 . . . and sent it to Kravitz; i) Morel admitted facts asserted by Plaintiff concerning water hose incident on August 19, 2015 to Kravitz; j) Morel had problem with Plaintiff's immigration status and/or going to the immigration appointment on July 10, 2015 and expressed it to Kravitz; and k) Morel did not like Plaintiff because she was Korean and old and expressed it to Kravitz.

<u>Defendant's Contentions</u>

The defendant contends that Shim-Larkin's motion for spoliation sanctions "must be denied in its entirety" because Shim-Larkin: (1) "failed to demonstrate that Defendant was in control of Kravitz's personal cellphone" or "had the legal authority to prevent Kravitz from recycling his phone"; (2) "failed to show that Kravitz recycled his cellphone with the intent to deprive Plaintiff of evidence"; (3) "assumes bad faith based on unsuppported assumptions"; and (4) ignored sworn evidence and material disclosed through discovery "which is diametrically opposed to the facts she requests to be deemed established as a sanction." The defendant concedes that the narrative section in Shim-Larkin's EEOC Charge put DPR on notice that text message communications between Shim-Larkin and Kravitz were relevant to this action. However, the defendant maintains that DPR was not aware that text messages exchanged by Morel and Kravitz were relevant to this action because "Plaintiff's EEOC Charge of Discrimination does not mention any such communications." The defendant maintains that, after the complaint in this action was served by Shim-Larkin on August 20, 2016, and the "Defendant appeared in this action on

-8-

September 14, 2016," Saint-Fort "sent DPR a Preservation Notice" on October 13, 2016. The defendant asserts that the Preservation Notice "is a privileged communication;" therefore, it was not disclosed to Shim-Larkin.

The defendant contends that Kravitz testified at his deposition that the "only communications he had with Plaintiff were through a mobile application 'Remind,' and that Plaintiff did not have his personal cellphone number." According to the defendant, it disclosed to Shim-Larkin "copies of [Kravitz's] Remind message history, not only with Plaintiff, but with Morel and other lifeguards." Furthermore, the defendant contends that on January 16, 2018, it "produced Kravitz's personal cellphone records" to Shim-Larkin. However, those records show only whether a text message was sent, as "the content of the text messages were [sic] not stored by Kravitz's cellphone carrier." Therefore, that information could not be obtained and shared with Shim-Larkin. According to the defendant, Kravitz's disclosure of his Remind message history and his AT&T telephone records demonstrates "that he had no intention to deprive Plaintiff of information regarding his communications, during the summer of 2015, with Miguel Morel" and other DPR lifeguard personnel. The defendant notes that Shim-Larkin was represented by pro bono counsel during Kravitz's December 5, 2017 deposition and her counsel could have questioned Kravitz about the content of any text message(s) he is alleged to have exchanged with Morel. However, Shim-Larkin's counsel chose not to do so. According to the defendant, this demonstrates that Shim-Larkin "was not prejudiced by the recyclying of Kravitz's cellphone."

The defendant maintains that the relief requested by Shim-Larkin through this motion is too harsh and uncalled for, based on the information developed during the pretrial discovery phase of the action. The defendant contends that, during Kravitz's deposition, he "testified that he was never informed that Plaintiff could not work on July 1, 2015 because of a doctor's appointment that was required for her to live in a domestic violence victim shelter." Therefore, he could not have communicated that information to Morel. Consequently, granting Shim-Larkin's request that it "be taken

-9-

as established for the purpose of this action" that Kravitz told Morel that Shim-Larkin could not work on July 1, 2015, because of a mandatory doctor's appointment required for Shim-Larkin to reside in a domestic violence shelter, is not warranted. The defendant also asserts that the Court would not be warranted in establishing as a fact for the purpose of this action, as Shim-Larkin requests, that Morel expressed to Kravitz "his hostility against Plaintiff for not working on July 1, 2015," due to the doctor's appointment, because, as noted above, Kravitz testified that he was not informed of Shim-Larkin's July 1, 2015 doctor's appointment and, as a result, Kravitz, could not have told Morel of that appointment.

The defendant maintains that having the Court establish, as a fact for the purpose of this action, that Morel admitted to Kravitz that Shim-Larkin complained to Morel about the inequality in the number of breaks from work that she, Morel and Navarro received is unnecessary, because Kravitz testified to his awareness of Shim-Larkin's complaints "about not getting an equal number of breaks as compared to Morel and Navarro." According to the defendant, Shim-Larkin could have deposed Morel to determine "whether he was the source" of the information Kravitz received about the controversy concerning the number of breaks the three TSMP lifeguards were receiving, but Shim-Larkin did not depose Morel. The defendant contends that, in any event, eliciting such testimony from Morel would, in this circumstance, "have only been redundant" given Kravitz's testimony that he was aware of Shim-Larkin's complaints.

With respect to Shim-Larkin's request that the Court establish as a fact for the purpose of this action that Morel expressed to Kravitz that he would not "give equal breaks to Plaintiff as Morel and Navarro," the defendant contends that Kravitz "was never asked and did not testify" at his deposition that Morel made such a statement to him. Furthermore, Shim-Larkin did not depose Morel "to have him confirm or deny" the statement. Therefore, the defendant asserts, no basis exists for: 1) Shim-Larkin "believing that such a statement was made"; or 2) the Court to establish the statement as a fact for the purpose of this action. Kravitz's deposition testimony, that he told the three TSMP lifeguards that each had to receive the same number of breaks from work as the others, that is, "everybody has to sit the same

-10-

amount of time, equal," contradicts the statement Shim-Larkin has proffered for the Court to establish as fact: "Kravitz agreed with Morel on not giving Plaintiff equal breaks as Morel and Navarro." Therefore, according to the defendant, the Court must reject Shim-Larkin's request concerning that statement.

The defendant maintains that the statement "Morel admitted all facts asserted by Leticia Vargas is incomprehensible[,] as Plaintiff does not assert what facts she is referring to or when they were asserted." The defendant contends that this militates against the Court establishing the statement as a fact for the purpose of this action. Moreover, according to the defendant, inasmuch as Kravitz testified "about an incident involving a pool patron, Leticia Vargas," based on "information that he received from Morel [and furthermore, given that] Plaintiff never deposed Morel to see if his recollection of the incident accorded with either Kravitz or Vargas," Shim-Larkin's failure to depose Morel provides another basis for denying Shim-Larkin's request.

The defendant contends that Shim-Larkin's request that it be established as a fact for the purpose of this action that "Morel admitted that he made the sitting schedule on July 30, 2015 . . . and sent it to Kravitz," is "wholly disingenuous" because the defendant admitted previously that the handwriting on the schedule is Navarro's handwriting. Therefore, Shim-Larkin is "aware that Navarro made the sitting schedule." "Moreover, Kravitz testified that [he] received the schedule . . . from Shim-Larkin." Consequently, establishing as a fact for the purpose of this action the statement respecting the making of the sitting schedule and its transmission to Kravitz, as Shim-Larkin has requested, is not warranted. The defendant also maintains that the statement that Morel created the August 4, 2015 video and sent it to Kravitz has been conceded through Kravitz's deposition testimony. Therefore, no need exists for the Court to establish that fact for the purpose of this action. The defendant contends that: 1) Kravitz's testimony about the August 19, 2015 water hose incident; and 2) Morel's February 21, 2018 declaration submitted in support of the defendant's summary judgment motion, through which he recounts "his version of events regarding this incident, including that he was hosing the pool deck so that children

-11-

would not burn their feet" on the pool deck surface, when some water from the hose touched Shim-Larkin's foot inadvertently obviate the need for the Court to establish as a fact for the purpose of this action, as Shim-Larkin requests, that Morel admitted to Kravitz the facts Shim-Larkin asserted concerning the incident. That "Morel had a problem with Plaintiff's immigration status" or her attending an immigration-related appointment on July 10, 2015, should not be established by the Court as a fact for the purpose of this action because, according to the defendant, Kravitz testified that "he was unaware of such an appointment" and in Morel's February 21, 2018 declaration he stated that he was "unaware of Plaintiff's immigration status" and did not know of her immigration-related appointment. Therefore, the defendant asserts that "Morel never informed Kravitz of" Shim-Larkin's immigration-related appointment. The defendant maintains that Shim-Larkin's request that it be established as a fact for the purpose of this action, that Morel expressed to Kravitz his dislike of her because she is Korean and old must be denied because Shim-Larkin "concedes" the statement is "entirely speculative." Moreover, in addressing the matter in her amended complaint, Shim-Larkin contends that in Navarro's recounting of what she expressed to Morel and others about Shim-Larkin's age and national origin as it relates to Shim-Larkin's performance as a lifeguard, "Morel did not say anything in response."

The defendant maintains that much of Shim-Larkin's motion is grounded in speculation and conjecture "about [the] content of communications between Kravitz and Morel." However, her speculation and conjecture are largely contradicted by Kravitz's deposition testimony and Morel's February 21, 2018 declaration. The defendant asserts that, since the text messages about which Shim-Larkin is complaining "could be about any topic, Plaintiff cannot simply conclude that they relate to her or are relevant to this action because they were sent during the summer of 2015." The defendant contends that inasmuch as Shim-Larkin cannot show prejudice or that Kravitz discarded his personal cellular telephone intending to deprive her of relevant evidence, no spoliation sanction is appropriate in this case. The defendant maintains that, even if the Court found that spoliation occurred and, according

-12-

to the defendant, no basis for such a finding exists, the harsh sanction Shim-Larkin proposes, that certain "facts be taken as established for the purpose of this action," should not be imposed; instead, the Court should comply with "the edict that the Court apply the least harsh sanction."

Plaintiff's Reply

Shim-Larkin contends that Kravitz used his personal cellular telephone for DPR business purposes; that is, he used that device in his official capacity as the defendant's assistant lifeguard coordinator to communicate with the TSMP lifeguards he supervised and other DPR employees. As a result, "the communications made through Kravitz's 'personal' cell phone are business records" of the defendant. As a consequence, Kravitz became the "custodian of such communications as part of his official capacity, and discarded such communication records by 'donating' the cell phone device. Therefore, since Kravitz's disposal of the communication records are done within his representative capacity as an agent of Defendant, Defendant is liable for Kravitz's . . . actions." Furthermore, Shim-Larkin maintains that, as the defendant's custodian of records, Kravitz took on certain obligations, including the duty to produce the records on proper demand by the defendant. Thus, Kravitz's disposal of his cellular telephone with pertinent work-related text messages, must be deemed an act of the defendant and not a personal act.

Shim-Larkin maintains that the defendant failed "to present any evidence regarding preservation efforts undertaken between the receipt of Plaintiff's EEOC charge, on November 16, 2015 and purported issuance of Preservation Notice on October 13, 2016." According to Shim-Larkin, as the defendant did not dispute that it was in a position reasonably to anticipate that litigation would ensue upon receipt of her EEOC Charge, Frinquelli should have taken steps to preserve relevant records: Kravitz's work-related text messages. The "logical inference that can be drawn from these facts are [sic] that DPR intentionally did not take any steps to preserve text message records." Therefore, Shim-Larkin asserts that by relying on circumstantial evidence and showing that Kravitz and Morel are not worthy of belief,

-13-

she has satisfied "the requisite level of intent required by FRCP 37(e)(2)" for it to be presumed that the lost information was not favorable to the defendant.

Shim-Larkin maintains that the defendant's assertion that it was unaware that text messages between Morel and Kravitz "were relevant to this action" because the EEOC Charge she lodged did "not mention such communications" is incredible, given that the Court explained the relevance to the parties during a telephone conference on November 30, 2018. Shim-Larkin contends that the defendant's assertion that she is not prejudiced by the absence of Kravitz's personal cellular telephone and the text messages on it he exchanged with Morel, because she has Kravitz's deposition testimony and Morel's February 21, 2018 declaration submitted in support of the defendant's motion for summary judgment, is untenable because "Kravitz and Morel's testimonies are [not] equivalent to text" messages they exchanged with each other in the summer of 2015.

Shim-Larkin asserts that equally untenable is the defendant's claim that she could have deposed Morel but elected not to. According to Shim-Larkin, the defendant overlooks the fact that depositions are expensive and that she is proceeding in this action in forma pauperis. Therefore, the suggestion that she merely had to take Morel's deposition, but elected not to ignores the reality of her economic circumstance.

Shim-Larkin also asserts that Kravitz is not credible because he made "false statements" in the DPR EEOC position statement, as it relates to his claim that: (1) Shim-Larkin did not have his personal cellular telephone number; and (2) he has no recollection of having communicated with Shim-Larkin via text message. His lack of credibility is established, by Kravitz's AT&T telephone records which show that they did exchange text messages outside the Remind mobile application Kravitz used. Shim-Larkin maintains that it would not have been possible for her to exchange text messages with Kravitz, as shown in the AT&T telephone records, outside the Remind mobile application without having Kravitz's personal cellular telephone number. Shim-Larkin contends that Kravitz's credibility is also undermined by her receipt of his Remind text message history records, which also establish that they communicated

-14-

via text messages.  Shim-Larkin notes that although the defendant claimed Kravitz testified at his

deposition that his only communications with her were through the Remind mobile application, and in

support of that assertion referred her to Exhibit B to Saint-Fort declaration, which is an excerpt from

Kravitz's deposition transcript, the portion for the deposition transcript purported to contain the relevant

testimony is not in Exhibit B.  Shim-Larkin also notes that "Kravitz refused to admit that he used Remind

as late as August 3, 2017, as indicated in the first response [the defendant made] to Plaintiff's

Interrogatory No. 4 in first set of interrogatory.  See [sic] ECF #111-1, at 6-7 ('assumes facts not

admitted . . . ')."

According to Shim-Larkin, she established previously that "Morel's declaration dated February

21, 2018 (ECF #315) is not credible in [her] July 23, 2018 motion (ECF #344-346)" by, for example,

showing discrepancies between Morel's recollection of the weather conditions on August 19, 2015, the

date of the water hose incident, and the actual weather conditions.  According to Shim-Larkin, the actual

weather conditions establish no necessity existed for hosing the pool deck to prevent children's feet from

burning as Morel claimed.  Shim-Larkin contends that these discrepancies also undermine Morel's

assertion, in the February 21, 2018 declaration, that he sprayed plaintiff with water inadvertently and not

intentionally.  Furthermore, Morel's declaration "mischaracterizes [her] complaint" about breaks from

work accorded her and the other TSMP lifeguards by claiming Shim-Larkin's complaint was that she

wanted to take more breaks than the other lifeguards, when her complaint was that she and the other

TSMP lifeguards were not getting an equal number of breaks, as corroborated by Kravitz's deposition

testimony.

With respect to the defendant's claim that Shim-Larkin did "not assert what facts she was

referring to" when she requested that the Court establish as a fact for the purpose of this action that

Morel admits all facts asserted by Vargas, Shim-Larkin maintains that it is clear that she was referencing

all the "factual assertions" in Vargas's declaration and de bene esse deposition respecting Vargas's

observations on July 21, 2015, of "Morel screaming at Plaintiff in a threatening manner and alcohol

-15-

smell from Morel." In addition, Shim-Larkin contends that the defendant attempted to insulate Morel from the creation of the pool deck sitting schedule by noting that it admitted the schedule is drafted in Navarro's handwriting. Shim-Larkin maintains that, the schedule is the product of Navarro's handwriting, because Navarro served as Morel's reporter: "it is a semi-automatic habit of Morel and Navarro that i) Morel tells Navarro to write documents for him and ii) Navarro writes them and that is why the handwriting of the sitting schedule is Navarro's."

Shim-Larkin maintains that the defendant is wrong when it states that Kravitz testified that Morel sent the August 4, 2015 video to Kravitz. According to Shim-Larkin, Kravitz "testified that he watched [the video] on Morel's phone." Moreover, "there is no admission from Defendant that Morel is the one who recorded the video."

Concerning Morel's "problem with [Shim-Larkin's] immigration status" and her need to attend an immigration-related appointment on July 10, 2015, Shim-Larkin asserts that according to the "Defendant's initial disclosure (ECF #346-1), Morel has information about Plaintiff's 'attendance during the 2015 summer.'" This indicates to Shim-Larkin that Morel "knew that Plaintiff was away from the pool on July 10, 2015," to keep an immigration-related appointment. In addition, Shim-Larkin contends that the defendant mischaracterized what Shim-Larkin has communicated through her amended complaint about Morel's hostility toward her because of her age and national origin and what he "expressed . . . to Kravitz" in that regard. According to Shim-Larkin, all that she has indicated is that Morel did not "rebuke Navarro for implying that Ms. Shim-Larkin was a less valuable employee because she was Korean." Shim-Larkin maintains that, contrary to the defendant's assertion, she "did not allege that Morel did not say anything to agree with Navarro." Shim-Larkin contends that "[r]egarding the conversation among Navarro, Morel, Kravitz and Rios, [referenced immediately above,] only limited information was delivered from Navarro to Plaintiff and Plaintiff does not have first hand knowledge" of that conversation.

-16-

According to Shim-Larkin, the defendant's assertion that "[a]ny text message that existed between Kravitz and Morel could be about any topic," is contradicted by the "temporal proximity between the incidents and text messages." Shim-Larkin maintains "that temporal proximity is an objective factor which courts can [use to] measure the credibility of allegations in various situations." Shim-Larkin urges the Court to grant her motion.

## · DISCUSSION

"Rule 34 of the Federal Rules of Civil Procedure requires a party to produce documents and other tangible objects that are within the party's 'possession, custody, or control.'" Coventry Capital US LLC v. EEA Life Settlements, Inc., 329 F.R.D. 508, 514 (S.D.N.Y. 2019). Control, as that word is used in Rule 34, "does not require that the party have legal ownership or actual physical possession of the documents [and other tangible objects] at issue; rather, documents [and other tangible objects] are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents [and other tangible objects] from a non-party to the action." The Bank of New York v. Meridien Biao Bank Tanzania Ltd., 171 F.R.D. 135, 146 (S.D.N.Y. 1997). "Courts have repeatedly found that employers have control over their employees and can be required to produce documents [and other tangible objects] in their employees' possession." Chevron Corp. v. Salazar, 275 F.R.D. 437, 448 (S.D.N.Y. 2011).

"Spoilation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Limited v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001). The filing of a charge of discrimination with the EEOC can trigger a duty to preserve evidence. See Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003). This is so because "[t]he duty to preserve arises, not when litigation is certain, but rather when it is

-17-

'reasonably foreseeable.'" Alter v. The Rocky Point School Dist., No. 13-1100, 2014 WL 4966119, at

*8 (E.D.N.Y. Sept. 30, 2014) (citation omitted). To fulfill the obligation to preserve evidence "a litigant

must take affirmative steps to prevent inadvertent spoliation." R.F.M.A.S., Inc. v. So, 271 F.R.D. 13, 24

(S.D.N.Y. 2010). This is often accomplished by issuing a notice to key players in the litigation directing

them to preserve relevant material so that it may be available for disclosure during the pretrial phase of

the litigation. When ESI, such as text messages, is lost because a party failed to take steps to preserve it,

Rule 37 of the Federal Rules of Civil Procedure permits a court to impose a sanction on the party that

failed to preserve ESI.

> If electronically stored information that should have been preserved in the
> anticipation or conduct of litigation is lost because a party failed to take reasonable steps
> to preserve it, and it cannot be restored or replaced through additional discovery, the
> court: (1) upon finding prejudice to another party from loss of the information, may order
> measures no greater than necessary to cure the prejudice; or (2) only upon finding that
> the party acted with the intent to deprive another party of the information's use in the
> litigation may: (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to
> the party; or (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

Receipt of Shim-Larkin's EEOC Charge on November 16, 2015, placed the defendant on notice,

through DPR, that litigation was likely to ensue and, at a minimum, that text messages exchanged

between Shim-Larkin and Kravitz would be relevant to any ensuing litigation. The defendant's assertion

that DPR was unaware that text message communications between Morel and Kravitz would also be

relevant in any ensuing litigation brought by Shim-Larkin because Shim-Larkin's EEOC Charge does not

mention any such communications, is undermined by the defendant's failure to submit evidence, via an

affidavit or other means, from a DPR representative concerning what that agency knew about text

message communications exchanged by Kravitz and Morel and the relevance of those communications to

the EEOC Charge and to litigation that might ensue.

The motion record permits the reasonable inference to be drawn that since Kravitz used his

personal cellular telephone without objection from the defendant, his employer, as the primary vehicle

through which he communicated with the defendant's lifeguard personnel under his supervision concerning their DPR work activities, and further, communicated with Shim-Larkin via text messages, as demonstrated by his Remind message history records and AT&T telephone records, that he communicated with the other lifeguard personnel under his supervision, such as Morel, using the same means of communication: text messages. Therefore, based on the motion record, the defendant, as Kravitz's employer, had control over the contents of Kravitz's text messages pertaining to his work-related activities, and had an obligation to take affirmative steps to preserve evidence of those DPR work-related text messages from the summer of 2015, that Kravitz stored on his personal cellular telephone and which are pertinent to this action. However, the defendant took no action to preserve the text message evidence for approximately 11 months, the time between its receipt of Shim-Larkin's EEOC Charge on November 16, 2015, and October 13, 2016, when Saint-Fort sent DPR the Preservation Notice, the content of which is unknown. The defendant asserts that the content of the Preservation Notice is "privileged," but the defendant failed to indicate which privilege it is asserting. Therefore, it is not possible for the Court to determine the verismilitude of that assertion. In any event, by the time the Preservation Notice was sent to DPR, Kravitz had donated his personal cellular telephone months earlier, in March 2016, and thus, the contents of the work-related text messages he exchanged with Morel during the summer of 2015, which Shim-Larkin seeks, were lost forever.

The defendant has not provided any evidence, via an affidavit or other means, from DPR to establish that its failure to preserve Kravitz's work-related text messages, once it learned in November 2015 that those messages may be relevant to future litigation, was the product of an accident or mistake. This permits the Court to conclude that the defendant acted intentionally to deprive Shim-Larkin of use of the information in this litigation. In the circumstance of the instant case, the Court finds that the defendant failed to take reasonable steps to preserve the text messages communicated between Kravitz and Shim-Larkin, and those communicated between Kravitz and Morel as indicated in Kravitz's AT&T telephone records and, as a consequence, those text messages cannot be restored or replaced through the

use of additional discovery tools, as contemplated by Rule 37(e). Given the frequency with which Kravitz used his personal cellular telephone to communicate via text message with his lifeguard subordinates, during the summer of 2015, as is demonstrated through his Remind message history records and AT&T telephone records that are part of the motion record, the loss of the text messages means that a contemporaneous record of the contents of communications exchanged by Kravitz and his TSMP lifeguard subordinates at or about the time of events significant to this action have been lost to the parties forever. This prejudices Shim-Larkin, as she maintains, see CAT3, LLC v. Black Linage, Inc., 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016), because Shim-Larkin will not be able to present, at trial, relevant evidence of the: 1) charged environment in which she alleges she worked during the summer of 2015; 2) statements that were made to her and about her, which may support her allegations of discrimination; and 3) efforts, if any, she made to extricate herself from the situation all of which Shim-Larkin contends prompted her to file the EEOC Charge and this action.

The defendant asserts that AT&T, Kravitz's cellular telephone service provider, did not store the contents of Kravitz's text messages; therefore, the defendant could not obtain that information and share it with Shim-Larkin. However, the defendant provided no evidence from AT&T, via affidavit or otherwise, to corroborate that assertion. In any event, the circumstantial evidence Shim-Larkin has presented concerning the timing of the text messages exchanged by Kravitz and Morel that Shim-Larkin alleges related to her, and to specific events at TSMP involving her, allows for an inference in Shim-Larkin's favor that the unpreserved text message evidence would have been relevant to the issues in this action and would have aided her in substantiating the claims made in this action. See Kronisch, 150 F.3d at 128. In this regard, the Court is mindful that "holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would . . . allow parties who have intentionally destroyed evidence to profit from the destruction." Id. at 128.

Kravitz's claim in the DPR position statement, that he did not recall exchanging text messages with Shim-Larkin or providing her with his cellular telephone number, is suspect, given: 1) his admission

-20-

that his personal cellular telephone was the primary means of communicating for work-related matters; and 2) the volume of text message communications the motion record shows he had with DPR personnel including his TSMP lifeguard subordinates in the summer of 2015. Thus, it is curious that in December 2015, when he was interviewed by Frinquelli, which was just four months after Shim-Larkin ceased working with him, Kravitz would have forgotten completely having communicating with Shim-Larkin via text message. The defendant chastises Shim-Larkin for not inquiring of Kravitz at his deposition about the contents of the lost text messages he exchanged with Morel. However, given Kravitz's inability to remember text messages he exchanged with Shim-Larkin within four months of their occurrence in 2015, the prospect of his remembering the contents of text messages from the summer of 2015, in December 2017, is extremely doubtful.

It appears to the Court, based on the motion record, that Kravitz knew that his personal cellular telephone, which he used to conduct the defendant's work-related activities, had text messages on it that would be lost once he donated the telephone in March 2016, because the exchange of text messages by him and DPR lifeguard personnel was discussed with him by Frinquelli, just three months before in December 2015, in order to prepare DPR's EEOC position statement. Aware that text-message evidence relevant to events at TSMP during the summer of 2015 existed on his personal cellular telephone, and with no demand from the defendant to provide it with the contents of those text messages so that the defendant might preserve them for future litigation that was reasonably likely to ensue, Kravitz donated the cellular telephone. This deprived Shim-Larkin of any possibility of retrieving the contents of the text messages stored on that cellular telephone and ensured that Shim-Larkin would not be able to use the text messages in the EEOC proceeding and, if necessary, at a trial.

As a consequence of the defendant's failure to take reasonable action to preserve relevant ESI evidence that is lost forever, owing to Kravitz's donation of his personal cellular telephone, Shim-Larkin urges that the Court sanction the defendant by directing that certain facts be "established for [the] purpose of this action." "The determination of an appropriate sanction for spoilation . . . is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." Fujitsu, 247 F.3d at 436. The Court declines to adopt Shim-Larkin's proposed sanction, in part, because the motion record establishes that several of the statements she wishes to have established as fact for the purpose of this action concern hotly contested matters that would require the Court to make credibility determinations that are best left to the jury. For example, Shim-Larkin has requested that it be established as fact for the purpose of this action that Kravitz told Morel that Shim-Larkin would be absent from work on July 1, 2015, to attend a medical appointment in connection with her continuing to reside in a domestic violence victim shelter. According to Shim-Larkin, she was permitted to absent herself from work on July 1, 2015, by a DPR lifeguard coordinator, whom she does not identify in her motion papers. The defendant maintains that Kravitz testified at his deposition that he was never informed that Shim-Larkin had to attend a medical appointment on July 1, 2015, in connection with her shelter residence and consequently could not have relayed that information to Morel. No evidence exists in the motion record establishing that the unidentified lifeguard coordinator who excused Shim-Larkin from working on July 1, 2015, communicated to Kravitz that Shim-Larkin would be absent from work on July 1, 2015, and the reason for her absence.

In addition, Shim-Larkin wants it to be established as fact for the purpose of this action that Kravitz agreed with Morel that Shim-Larkin should not receive an equal number of breaks

-22-

from work as the other TSMP lifeguards. The defendant contends, to the contrary, that Kravitz's

deposition testimony is that he advised the TSMP lifeguards that "everybody has to sit the same

amount of time, equal." Furthermore, in determining not to adopt Shim-Larkin's proposed

sanction, the Court also considered that in one instance, a fact Shim-Larkin wishes to have

established for the purpose of this action: that "Morel did not like Plaintiff because she was

Korean and old and expressed it to Kravitz," is a factual statement that Shim-Larkin's motion

papers attributed to Navarro, not to Morel. Therefore, granting Shim-Larkin's request with

respect to that factual statement is clearly not warranted, based on the motion record.

In the circumstance of this case, the Court finds that allowing Shim-Larkin to present to

the jury that quantum of evidence that will enable it to consider "the gravity of the [defendant's]

conduct, the materiality of the evidence" that the defendant allowed to be destroyed and "the

import of the remaining proof," coupled with an instruction to the jury that it may presume that

the lost information was unfavorable to the defendant, is an appropriate spoilation sanction.

Chan v. Triple 8 Palace, Inc., No. 03 Civ. 6048, 2005 WL 1925579, at *10 (S.D.N.Y. Aug. 11,

20015); see Fed. R. Civ. P. 37(e)(2)(B). The Court finds that this is a meaningful sanction that

"will properly place the risk of an erroneous judgment on the [defendant who, in this case,]

wrongfully created the risk" and will have the effect of "restoring the prejudiced party to the

same position [she] would have been in absent the wrongful destruction of evidence by the

opposing party." Kronisch, 150 F.3d at 126.

In addition, Shim-Larkin shall recover from the defendant the reasonable costs and

expenses she incurred in connection with the motion. To that end, within 14 days of the date of

this memorandum and order, Shim-Larkin shall file with the court evidence of those reasonable

-23-

costs and expenses. Within seven days of being served with the plaintiff's submission, the

defendant shall file with the court any challenge to the reasonableness of Shim-Larkin's costs and

expenses. Any reply by Shim-Larkin shall be filed with the court within three days of being served with

the defendant's challenge. The above-noted sanctions are imposed pursuant to Rule 37(e) of the Federal

Rules of Civil Procedure and the Court's inherent power. See Ottoson v. SMBC Leasing and Finance,

Inc., 268 F. Supp.3d 570, 579-80 (S.D.N.Y. 2017). The Court declines to grant relief pursuant to the

other provisions of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927, as requested by Shim-

Larkin, because the motion record does not support doing so.

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for spoilation sanctions, Docket Entry No.

462, is granted.

Dated: New York, New York
September 16, 2019

SO ORDERED:

*Kevin Nathaniel Fox*

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

*shim-larkin-mo11*

-24-